

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-21-2004

# Khodara Env Inc v. Blakey

Precedential or Non-Precedential: Precedential

Docket No. 02-4038

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Khodara Env Inc v. Blakey" (2004). *2004 Decisions.* Paper 433.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/433

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

KHODARA ENVIRONMENTAL, INC.,
GENERAL PARTNER, ON BEHALF
OF EAGLE ENVIRONMENTAL, L.P.

v.

*MARION BLAKEY; FEDERAL
AVIATION ADMINISTRATION;
CLEARFIELD-JEFFERSON
COUNTIES REGIONAL
AIRPORT AUTHORITY; DONALD R.
JOHNSON; PAUL SEKULA;
WILLIAM MIKSICH; FREDERICK G.
MURRAY; TIM MORGAN;
ROBERT E. REITZ; HENRY DEIBLE;
PAUL MCMILLEN;
MARK MCKINLEY;

JEFFERSON COUNTY; PINE CREEK
TOWNSHIP (Intervenor-defendants in
D.C.)

(D.C. No. 97-cv-00093E)

LEATHERWOOD, INC.

v.

THE PENNSYLVANIA
DEPARTMENT OF
ENVIRONMENTAL
PROTECTION; JEFFERSON

COUNTY, PENNSYLVANIA;
PINECREEK TOWNSHIP; FEDERAL
AVIATION ADMINISTRATION;

**MARION BLAKEY

(D.C. No. 01-cv-00018E)

Khodara Environmental, Inc.,

Appellant
*(Amended per Clerk's Order dated
01/16/03)
**(Amended per Court's Order dated
08/11/03)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF
PENNSYLVANIA

(Dist. Court No.  97-cv-00093E
and 01-cv-00018E)
District Court Judge: Honorable Sean
McLaughlin

Argued: October 24, 2003

Before: ALITO, FUENTES, and
BECKER, Circuit Judges.

(Opinion Filed: July 21, 2004)

William F. Fox, Jr., Esq. (argued)
J.P. Mascaro & Sons
320 Godshall Drive
Hurleysville, PA 19438
*Attorney for Appellant*

Teal Luthy Miller, Esq. (argued)
Scott R. McIntosh, Esq.
United States Department of Justice
601 D Street N.W.
Washington, DC 20530
*Attorney for Appellee Federal
Aviation Administration and Marion
Blakey*

Robert P. Ging, Jr., Esq. (argued)
2095 Humbert Road
Confluence, PA 15424
*Attorney for Appellees Jefferson
City and Township of Pine Creek*

OPINION OF THE COURT

ALITO, Circuit Judge:

Khodara Environmental, Inc., the general partner of a company (Eagle Environmental, L.P.) that wishes to develop the "Happy Landing Landfill" in Jefferson County, Pennsylvania, contests the District Court's denial of its request for a declaratory judgment that the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("the Wendell Ford Act") does not prohibit the landfill. The Federal Aviation Administration ("FAA"), Jefferson County, and Pine Creek Township argue that the Wendell Ford Act does prohibit the landfill. In addition, the FAA argues that Khodara and Eagle (hereinafter collectively "Eagle") lack Article III standing and that their claim is not ripe. For the reasons stated below, we reverse and remand for the entry of the declaratory judgment Eagle sought.

I.

For some time now, Eagle has desired to develop a solid waste disposal facility on land that it owns in Jefferson County. The facility, which is located approximately 5.25 miles from the Dubois-Jefferson County Airport, was intended to accept municipal waste primarily from out-of-state producers. In the early 1990s, Eagle began to apply to the Pennsylvania Department of Environmental Protection (hereinafter "DEP") for permits that were needed to operate the facility, and the DEP issued all of the permits that were required. See Khodara Envtl., ex rel. Eagle Envtl. v. Beckman, 237 F.3d 186, 189 & n.1 (3d Cir. 2001)("Khodara I"). After receiving these permits, Eagle took steps to develop the facility, including obtaining engineering studies of the site, installing 12 groundwater monitoring wells, beginning work on an access road, and installing a perimeter silt fence.

In September 1996, however, the Pennsylvania Fish and Boat Commission designated three tributaries near the landfill site as wild trout streams. As a result, the DEP determined that wetlands in and around Happy Landing Landfill were of such an exceptional value that they should not be filled. Shortly thereafter, the DEP revoked authorization to fill in any wetlands and suspended the other permits. Eagle appealed to the Environmental Hearing Board. While the appeal was pending, Eagle and the DEP entered into a

2

consent order and agreement that released the bonds that Eagle had submitted in the process of obtaining one of its permits. In exchange, Eagle agreed not to construct or operate the landfill until that permit was reinstated and the applicable bonding requirements were met. In September 1998, the Environmental Hearing Board issued an administrative order affirming the DEP's suspension order. See Eagle Envtl. L.P. v. Commonwealth of Pa. Dep't of Envtl. Protection, EHB Docket. No. 96-215-MG, 1998 WL 612838 (Pa. Hrg. Bd. Sept. 3, 1998). This decision was affirmed by the Pennsylvania Commonwealth Court, see Eagle Envtl. L.P. v. Commonwealth of Pa. Dep't of Envtl. Protection, No. 2704 C.D. 1998 (Pa. Commw. Ct. 2001); App. at 122, and the DEP's suspension order became final when the Pennsylvania Supreme Court denied further review. See Eagle Envtl. L.P. v. Commonwealth of Pa. Dep't of Envtl. Protection, 800 A.2d 934 (Pa. 2002); App. at 9a.

In October 1996, while these state proceedings were in progress, Congress enacted the Federal Aviation Reauthorization Act of 1996 ("FARA"), Pub. L. No. 104-264, 110 Stat. 3213. Section 1220 of FARA, which was drafted by two members of the House of Representatives from the area near the Happy Landing Landfill site, was apparently "intended to single out Happy Landing Landfill for regulation." See Khodara I, 237 F.3d at 190 n.4. Because landfills tend to attract birds and because birds can present a safety problem for aircraft flying at low altitudes, the FAA regulates the development of landfills near airports. It appears that the Happy Landing Landfill site was permitted by the FAA regulations in effect before FARA was enacted, see id. at 189 n. 3, but Section 1220 of FARA imposed an additional restriction that applied only under very narrow circumstances.

Section 1220 provided in relevant part:

> For the purpose of enhancing aviation safety, in a case in which 2 landfills have been proposed to be constructed or established within 6 miles of a commercial service airport with fewer than 50,000 emplanements per year no person shall construct or establish either landfill if an official of the Federal Aviation Administration has stated in writing within the 3-year period ending on the date of enactment of this subsection that 1 of the landfills would be incompatible with aircraft operations at the airport, unless the landfill is already active on such date of enactment or the airport operator agrees to the construction or establishment of the landfill.

3

49 U.S.C. § 44718(d) (amended by Pub. L. No. 106-181, § 503(b), 114 Stat. 61, 133 (2000) (codified at 49 U.S.C. § 44718(d))). Since the Dubois-Jefferson County Airport was a "commercial service airport with fewer than 50,000 emplanements per year" and since two landfills (Happy Landing Landfill and one other) had been proposed for construction within six miles of the airport, Section 1220 was potentially applicable to that airport. Moreover, according to a statement attributed to one of the sponsors of this provision, the DuBois-Jefferson County Airport was *the only* airport in the country to which Section 1220 applied. See Khodara I, 237 F.3d at 190 n.4.

After FARA was enacted, Eagle commenced this action, seeking, among other things, a declaration that Section 1220 was unconstitutional and that it did not apply to the Happy Landing Landfill. In March 1999, the District Court granted partial summary judgment in favor of Eagle, holding that Section 1220 failed rational-basis review under the Equal Protection Clause. See Khodara Env't, Inc. v. Beckman, 91 F. Supp. 2d 827, 850-57 (W.D. Pa. 1999). Although the Court found that the government had a legitimate interest in preventing aircraft bird strikes, the Court saw no rational justification for the provisions that: (1) limited the ban to cases where exactly two landfills had been proposed; (2) restricted the provision to airports with fewer than 50,000 annual emplanements; (3) covered only commercial, and not commuter, airports; and (4) limited the statute to purely

retrospective effect. Cross-appeals were taken to this Court.

While these appeals were pending before us, Congress enacted the Wendell Ford Act, which replaced Section 1220 of FARA with a new and somewhat broader provision. Section 503(b) of the Wendell Ford Act, 49 U.S.C. § 44718(d) provides in pertinent part:

> (1) In general.–No person shall construct or establish a municipal solid waste landfill . . . that receives putrescible waste . . . within 6 miles of a public airport that has received grants under chapter 471 and is primarily served by general aviation aircraft and regularly scheduled flights of aircraft designed for 60 passengers or less unless the State aviation agency of the State in which the airport is located requests that the Administrator of the Federal Aviation Administration exempt the landfill from the application of this subsection and the Administrator determines that such exemption would have no adverse impact on aviation safety.
>
> (2) Limitation on applicability.–Paragraph (1) . . . shall not apply to the construction, establishment,

4

expansion, or modification of, or to any other activity undertaken with respect to, a municipal solid waste landfill if the construction or establishment of the landfill was commenced on or before the date of the enactment of this subsection.

49 U.S.C. § 44718(d)(1)-(2).

In August 2000, the FAA promulgated FAA Advisory Circular 150/5200-34 to provide "guidance on complying" with the Act. For our purposes, the Circular's most important portions are its definitions of the terms "construction" and "establishment." The Circular states:

> a. <u>Construct a municipal solid waste landfill</u> means excavate or grade land, or raise structures, to prepare a municipal solid waste landfill as permitted by the appropriate regulatory or permitting authority.
>
> b. <u>Establish a municipal solid waste landfill (MSWLF)</u> means receive the first load or putrescible waste on site for placement in a prepared municipal solid waste landfill.

FAA Advisory Circular 150/5200-34, Appendix 1 (a)-(b) (emphasis in original).

5

Because of the legal change effected by the Act, we vacated the portion of the District Court's opinion that had held that Section 1220 of FARA was unconstitutional, and we remanded to allow Eagle to file an amended complaint addressing the new Act. Khodara I, 237 F.3d at 195, 198.

On remand, Eagle filed an amended complaint seeking a declaratory judgment to the effect that Section 503(b) of the Wendell Ford Act does not apply to Happy Landing Landfill because, prior to the enactment of that Act, which became law on April 5, 2000, Eagle had commenced construction and establishment of the landfill within the meaning of Section 503(b)'s grandfather clause. See 49 U.S.C. § 44718(d)(2). In the alternative, Eagle sought a declaration that it was entitled to an exemption under 49 U.S.C. § 44718(d)(1) because the operation of Happy Landing Landfill would not have an adverse impact on aviation safety. Eagle also sought declarations that the Act was unconstitutional in various respects. Eagle, the FAA, and the other defendants all moved for summary judgment. All of the defendants argued that the Act prohibited the development of Happy Landing Landfill, and the FAA also argued that Eagle's Wendell Ford Act claims were barred for lack of standing and ripeness.

The District Court granted summary judgment for the defendants. On Eagle's claim that it fell within the grandfather clause in 49 U.S.C. § 44718(d)(2), the Court rejected the FAA's standing and ripeness arguments but concluded that Eagle had not commenced the construction or establishment of the landfill prior to the enactment of the Wendell Ford Act. On Eagle's claim that it was exempt because the landfill would not adversely affect aviation safety, the Court held that the claim was not ripe and therefore dismissed it without prejudice. The Court also granted summary judgment against Eagle on its constitutional claims. Eagle then filed this appeal and argues that its actions at Happy Landing Landfill bring it within the grandfather clause.[1]

II.

We begin by considering the FAA's argument that Eagle lacks Article III standing. See Joint Stock Soc'y v. UDV N. Am., Inc., 266 F.3d 164, 175 (3d Cir. 2001) ("Constitutional standing is a threshold issue that we should address before examining issues of prudential standing and statutory interpretation."); Peachlum v. City of York, 333 F.3d 429, 433 (3d Cir. 2003).

"Article III of the Constitution limits the federal judicial power to 'Cases' or 'Controversies,' thereby entailing as an 'irreducible minimum' that there be (1) an injury in fact, (2) a causal relationship

---

[1] Eagle does not seek review regarding its claim for an exemption under 49 U.S.C. § 44718(d)(1) or its constitutional claims.

between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." United Food and Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 551 (1996). See also, e.g., Bennett v. Spear, 520 U.S. 154, 162 (1997); Northeastern Fla. Chapter Associated Gen. Contractors of Am. v. Jacksonville, 508 U.S. 656 (1993). These "requirements ensure that plaintiffs have a 'personal stake' or 'interest' in the outcome of the proceedings, 'sufficient to warrant . . . [their] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on . . .[their] behalf.'" Joint Stock Soc'y, 266 F.3d at 175 (quoting Wheeler v. Travelers Ins. Co., 22 F.3d 534, 537-38 (3d Cir. 1994)).

A plaintiff seeking a declaratory judgment must possess constitutional standing but need not have suffered "the full harm expected." The St. Thomas–St. John Hotel & Tourism Ass'n v. Virgin Islands, 218 F.3d 232, 240 (3d Cir. 2000). In such a case, we have said, a plaintiff has Article III standing if "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id.

In the present case, these requirements are met. There certainly is "a substantial controversy" between Eagle and the defendants, and each side has interests that are adverse to the other. Eagle wishes to develop the Happy Landing Landfill and claims that this is permitted by the Wendell Ford Act, whereas the defendants take the position that the Act precludes development of the landfill. In addition, the dispute is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Although the FAA has not yet taken action against Eagle, the FAA's position regarding the application of the Act to the Happy Landing Landfill site is clear. And while the DEP's revocation or suspension of Eagle's permits presents an independent obstacle to the development of the facility, it is apparent that it would be inordinately expensive and impractical from a business standpoint for Eagle to attempt to cure that problem until the Wendell Ford Act issue is resolved. If it is settled that the Wendell Ford Act does not apply, Eagle asserts (and no party disagrees) that Pennsylvania law would permit Eagle to try to satisfy the Pennsylvania DEP by redesigning the Happy Landing Landfill facility, and Eagle intends to pursue this course if it is successful in this case. It is also noteworthy that no party has suggested that there is any way in which Eagle could have attacked both of the obstacles that it faces in a single proceeding. Under these particular circumstances, we believe that the standing requirements for a declaratory judgment case are met.

In arguing that Eagle's claim does not meet Article III requirements, the FAA focuses on the second and third prongs of the generally applicable test for constitutional standing, i.e., causation and redressability. The FAA begins by

7

identifying Eagle's injury as "the prohibition of its proposed landfill" and concedes that this injury "likely would satisfy the injury-fact-requirement," but the FAA maintains that "[t]he Wendell Ford Act's prohibition is not the direct cause of Eagle's inability to construct and operate the landfill." FAA's Br. at 13-14. "Rather," the FAA writes, "the DEP's decision to revoke a portion of Eagle's water obstruction and encroachment permit and suspend its remaining permits prevents Eagle from constructing the landfill and does so regardless of whether the Wendell Ford Act applies." Id. at 14. Similarly, the FAA maintains that "it is purely speculative whether Eagle's injury would be redressed by the declaration that it seeks" because even if the declaration were granted, the lack of state permits would block the development of the landfill. Id.

There are two ways in which this argument can be answered. First, under the circumstances present here, where Eagle faces two, independent regulatory obstacles that can only be attacked in separate proceedings, it makes sense to conceptualize Eagle's injury, not as "the prohibition of its proposed landfill" in the general sense, but as the prohibition of its landfill by the challenged application of the Wendell Ford Act. Cf. Northeastern Fla. Chapter Associated Gen. Contractors of Am. v. Jacksonville, 508 U.S. at 664-66 (injury in fact under the circumstances is not the ultimate denial of contract but the inability to compete on equal terms). When Eagle's injury is understood in this way, both the causation and redressability prongs are plainly satisfied.

Second, even if Eagle's injury is defined more narrowly as its inability to operate the landfill, the FAA's argument hinges on the proposition that the "causation" prong of the test for constitutional standing demands that the challenged conduct be a but-for cause of the plaintiff's injury. This proposition, however, is doubtful. Article III standing demands "a causal relationship," but neither the Supreme Court nor our Court has ever held that but-for causation is always needed. Moreover, it is well recognized that but-for causation is problematic in precisely the situation present here, i.e., where an effect is "causally over-determined," i.e., where there are multiple sufficient causes. Price Waterhouse v. Hopkins, 490 U.S. 228, 241 (1989) (opinion of Brennan, J.). See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 41 at 266-67 (5th ed. 1984); Richard W. Wright, Causation in Tort Law, 73 CAL. L. REV. 1735, 1775-76 (1985). A classic example in tort law is the hypothetical case in which a person is simultaneously hit with two lethal gun shots fired at the same time by two hunters. But-for causation leads to the absurd conclusion that neither shot was the cause of the victim's demise, and accordingly "[i]f two causes concur to bring about an event and either one of them, operating alone would have been sufficient to cause the identical result, some other test [i.e., other than but-for causation] is needed." Prosser and Keeton

on the Law of Torts, supra, § 41 at 266.

The FAA's argument in this case resembles the argument that neither of the hunters in the hypothetical mentioned above was the cause of the victim's death. The FAA's argument leads logically to the conclusion that any litigation commenced by Eagle to remove either of the two obstacles that prevent it from developing the Happy Landing Landfill site – the application of the Wendell Ford Act and the lack of permits – would fail Article III standards. Suppose, for example, that Eagle redesigned its facility but was unsuccessful in obtaining the needed state permits and then sought judicial review in the Pennsylvania courts. If those courts adhered to the same standing requirements that the FAA argues apply in federal court, the very same argument that the FAA now advances could be made with respect to Eagle's state-court litigation. It could be argued that "[the denial of the state permits] is not the direct cause of Eagle's inability to construct and operate the landfill. Rather, the [application of the Wendell Ford Act] prevents Eagle from constructing the landfill and does so regardless of whether the [the permits are granted]." FAA's Br. at 14. Likewise, it could be argued that "it is purely speculative whether Eagle's injury would be redressed by the [a state-court decision that it is entitled to the permits]" because even if such a decision were issued, the Wendell Ford Act would block the development of the landfill. Id. In short, under the logic of the FAA's argument, any attempt by Eagle to attack either one

of the obstacles that it faces would run afoul of the case-or-controversy requirement.

In our view, however, Article III does not dictate such an absurd result. Under the particular circumstances here, where Eagle faces two, independent obstacles that are potentially removable but that cannot be challenged in a single litigation, we believe that Article III allows Eagle to challenge each obstacle separately.

The FAA contends, however, that Article III demands that Eagle address its state-law problems *before* litigating the federal-law issues presented in this case, but the FAA provides no convincing explanation for its view. The FAA does not argue that the supremacy of federal over state law demands that state-law obstacles be removed first, and we see no basis for such an argument. Nor does the FAA contend that it is more efficient in this case for the state issues to be tackled first – and, if anything, the opposite seems to be the case. Rather, the FAA's only explanation for its position that Eagle must resolve the state issues first is that "the permitting process is logically prior to the construction and operation of a landfill." FAA's Br. at 16. The meaning of this statement is not clear, but if the FAA is arguing that the question whether Eagle is entitled to permits under state law "is logically prior" to the question whether the Wendell Ford Act prohibits the development of the Happy Landing Landfill facility, we do not follow the

9

FAA's logic. It does not seem to us that logic assigns priority to either the federal or state issues.

In sum, under the particular factual circumstances of this case, Eagle has Article III standing.

## III.

The FAA also argues that Eagle's claim is unripe because Eagle "has not shown that it will be able to obtain state permits to construct the proposed landfill," "has never sought a formal determination from the FAA that [the Wendell Ford] Act prohibits its landfill," and has not requested the state aviation agency to petition the FAA under 49 U.S.C. § 44718(d)(1) for an exemption for the Happy Landing Landfill facility. FAA's Br. at 16, 19.

The ripeness doctrine serves to "determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." Peachlum v. City of York, 333 F.3d 429, 433 (3d Cir. 2003) (citing Philadelphia Federation of Teachers, Am. Fed'n of Teachers, Local 3, AFL-CIO v. Ridge, 150 F.3d 319, 323 (3d Cir. 1998) and Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977)). Various considerations "underpin the ripeness doctrine," including whether the parties are in a "sufficiently adversarial posture to be able to present their positions vigorously," whether the facts of the case are "sufficiently developed to provide the court with enough information on which to decide the matter conclusively," and whether a party is "genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one." Peachlum, 333 F.3d at 433-34. In determining whether a case is ripe, we generally examine: "(1) 'the fitness of the issues for judicial decision,' and (2) 'the hardship to the parties of withholding court consideration.'" Id. at 434 (citing Abbott Labs., 387 U.S. at 149; see also Nextel Communications of the Mid-Atlantic, Inc. v. City of Margate, 305 F.3d 188, 193 (3d Cir. 2002).

In declaratory judgment cases, we apply a somewhat "refined" test "because declaratory judgments are typically sought before a completed injury has occurred." Pic-A-State Pa. Inc. v. Reno, 76 F.3d 1294, 1298 (3d Cir. 1996). Thus, when "determining whether to engage in pre-enforcement review of a statute in a declaratory judgment action," we look to "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment." Pic-A-State Pa. Inc. v. Reno, 76 F.3d 1294, 1298 (3d Cir. 1996) (citations omitted); see also Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643, 646-47 (3d Cir. 1990).

In considering whether Eagle's Wendell Ford Act claim is ripe, two decisions of other courts of appeals are instructive. In Gary D. Peake Excavating,

Inc. v. Town Board of the Town of Hancock, 93 F.3d 68 (2d Cir. 1996), a town enacted a local law prohibiting the operation of dumps. Id. at 70-71. This local law was enacted after the New York State Department of Environmental Conservation (the "DEC") promulgated new regulations that required a permit for construction and demolition ("C & D") debris landfills. Id. at 70. Peake, who owned land in the town and wanted to operate a C & D debris landfill, and his company sued the town, claiming that the local law was unconstitutional. Id. at 71. The town argued that the plaintiffs' claim was not ripe because they were not using the property for a debris landfill and because they could not use the property for such a facility without first obtaining a state permit. Id. at 72. The Second Circuit disagreed. Id. Observing that "[t]he issues presented by the Plaintiffs' claims are fit for judicial review because they are purely legal and may be decided without further factual development," the Court continued:

> Moreover, the Plaintiffs would suffer substantial hardship if judicial review were withheld. Peake already has spent "considerable sums" of money in an effort to obtain a permit from the DEC to operate a C&D landfill. He claims that he is "reluctant to spend more money to obtain the additional information required by [the DEC] because, even if a

permit were granted, Local Law No. 1 would still prevent [him] from operating [his] disposal facility." Reviewing the ordinance at this time will allow Peake to make an informed decision as to whether he should expend additional money to obtain a DEC permit to operate a C&D landfill. If we uphold the ordinance, Peake will be able to cut his losses by halting his efforts to obtain a DEC permit; if we invalidate the ordinance, Peake can continue with the DEC permitting process, knowing that obtaining the DEC permit would not be in vain. In contrast, if judicial review were withheld until Peake obtained a DEC permit, Peake would have to choose between (1) abandoning his plans to construct the C&D landfill in deference to a potentially unconstitutional ordinance and (2) expending "considerable sums" of money to obtain a DEC permit and thereafter commencing an action challenging the ordinance. We see no reason why Peake should have to expend substantial sums of money before challenging

11

the constitutionality of the ordinance. Nor should Peake be required to subject himself to the threat of the criminal penalties imposed by Law No. 1 in order to challenge the ordinance.

Id.

The case of Triple G Landfills, Inc. v. Board of Commissioners of Fountain County, 977 F.3d 287 (7th Cir. 1992), is also closely on point. There, Triple G wanted to build a landfill in Fountain County, Indiana, but county residents objected, and eventually the county adopted an ordinance that obligated a party wishing to construct a landfill to obtain a county permit in addition to the state-issued permit that was already required. Id. at 288. The stringent requirements of the new county ordinance effectively barred Triple G from constructing its landfill, and Triple G brought suit, challenging the constitutionality of the ordinance.

Before reaching the merits of the case, the Seventh Circuit held that Triple G's claims were ripe even though Triple G had not yet applied for either a state or a county permit. Triple G Landfills, Inc., 977 F.3d at 288-90. The Court began by stating that "[i]nquiries into ripeness generally address two factors: first, whether the relevant issues are sufficiently focused so as to permit judicial resolution without further factual development; and, second, whether the parties would suffer

any hardship by the postponement of judicial action." Id. at 289. The Court concluded that the first factor weighed heavily in favor of a finding of ripeness because the issues presented were "purely legal." Id. The Court then detailed why delay would "work a substantial hardship to Triple G." Id. "Postponing judicial action," the Court wrote, "would force an unwarranted dilemma upon Triple G." Id. at 290. It would be required either to "scuttle its development plans altogether in deference to a potentially invalid county regulation, or complete the expensive and time-consuming state permit process, submit a permit application that Fountain County is certain to reject, and then, after incurring substantial sunk costs, bring a facial challenge to the ordinance." Id. The Court concluded that this dilemma was unwarranted because delay would result in no "countervailing benefit–either to the judicial process or the public interest." Id. Even though there was a chance that the state would "turn down Triple G's permit application," the Court held, this was not "sufficient to defeat ripeness." Id.

We are persuaded by the analysis of the Second and Seventh Circuits in these cases, and for similar reasons, we hold that Eagle's claim is ripe. Looking to the factors enumerated in Pic-a-State Pa. Inc., 76 F.3d at 1298, we note, first, that "the adversity of the parties' interests" is evident and is not disputed by the FAA. Second, it is apparent that a judgment in this case will conclusively establish whether Happy Landing Landfill falls

12

within the Wendell Ford Act's grandfather clause. Third, a judgment on the merits will have significant practical value for Eagle. Eagle will then be in a position to know whether it should undertake the expensive project of redesigning the site plan and trying once again to obtain state permits.

In addition to these factors, we note that here, as in Gary D. Peake Excavating, Inc. and Triple G, delay will not lead to further development of relevant facts. The facts that are pertinent to the question of the application of the grandfather clause – regarding what Eagle did on the Happy Landing Landfill site prior to the critical date – are simple and undisputed. The crux of the issue on the merits – i.e., what the grandfather clause means by the "commence[ment]" of "the construction or establishment" of a landfill (49 U.S.C. § 44718(d)(2)) – is purely legal. We will not be in any better position to answer this question in the future than we are now. Nor do we see any other advantage in delay. Although the FAA argues that Eagle should be required to ask the FAA for a formal determination regarding the application of the grandfather clause, the FAA's position on that issue is perfectly clear. And as for the FAA's argument that Eagle should be required to ask the state aviation agency to petition the FAA for an exemption under 49 U.S.C. § 44718(d)(1), the futility of such a request is evident. We consequently hold that Eagle's claim is ripe.

IV.

We now consider the merits of Eagle's claim that the Happy Landing Landfill facility falls within the Wendell Ford Act's grandfather clause. The grandfather clause applies, Eagle argues, because it commenced the "construction" and "establishment" of the landfill facility before the enactment of the Wendell Ford Act.

A.

The parties' first point of disagreement is whether the Wendell Ford Act's grandfather clause is ambiguous. According to Eagle, the clause is clear and, as a result, the District Court erred in looking beyond the statutory language and in relying on the FAA Advisory Circular.

When interpreting a statute, we begin with the statutory language itself, and "[i]t is well established that 'when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." Lamie v. U.S. Trustee, 124 S.Ct. 1023, 1030 (2004) (citations omitted).

Here, we agree with the District Court that the grandfather clause is ambiguous. As noted, the clause states that Section 503(b) of the Wendell Ford Act, 49 U.S.C. § 44718(d)(1), does not apply to the "construction, establishment, expansion, or modification of, or to any other activity undertaken with respect to, a municipal solid waste landfill, *if the*

13

*construction or establishment of the landfill was commenced on or before the date of enactment*" of the Act. 49 U.S.C. § 44718(d)(2) (emphasis added). Since the word "commenced" modifies both "construction" and "establishment," we must ascertain what Congress meant by commencing construction and commencing establishment.

Eagle's argument that this language is clear has surface appeal because the relevant terms – "commenced," "construction," and "establishment" – are common and, in many contexts, their meaning is entirely plain. As used in the grandfather clause, however, the meaning of these terms is ambiguous.

In ordinary speech, "to commence" means "to enter upon," to "begin," to "start," or "to initiate formally by performing the first act of." Webster's Third New International Dictionary 456 (1971). "Establishment" may mean, among other things, "the act of bringing into existence, creating, founding, originating or setting up so that a certain continuance is assured" or "with permanence in view." Id. at 778. And "construction" means "the act of putting parts together to form a complete integrated object" or "fabrication." Id. at 489.

Unfortunately, these definitions are not sufficiently precise to pin down at exactly what point in the process of bringing a landfill into existence the grandfather clause takes effect. As the District Court noted and as the record bears out, that process is often complex and lengthy, requiring the acquisition of land, the satisfaction of legal requirements, many different stages of work on the site, the solicitation of business, and the beginning of actual operations. One could plausibly contend that the commencement of the establishment of a landfill takes place very early in this process. Along these lines, it could be argued that a party "start[s]" "the act of bringing [a landfill] into existence" "with permanence in view" when it takes the very first step of the process that it intends to bring about that result. Thus, if a party buys land for use as a landfill, that could be viewed as the commencement of the establishment of the landfill. At the other extreme, however, one could plausibly argue that the commencement of the establishment of a landfill does not occur until the point at which "a certain continuance is assured," and this might not be viewed as occurring until after the last legal obstacle is surmounted or, perhaps, until commercial operation actually begins. Because the statutory language referring to the "commence[ment]" of the "establishment" of a landfill can comfortably accommodate these widely divergent interpretations, it is not unambiguous.

Although "construction" is a more concrete concept than "establishment," the statutory reference to the "commence[ment]" of the "construction" of a landfill is also unclear. On the one hand, doing any physical work on the site could be viewed as a step in the "the act of

14

putting parts together to form a complete integrated object," i.e., the landfill. On the other hand, "construction" might be narrowly construed to mean the erection of a structure of some sort on the site.

For these reasons, we agree with the District Court that the statutory language is ambiguous.

### B.

Because the statutory language is ambiguous, we must consider whether to defer to the interpretation in FAA Advisory Circular 150/5200-34, which defines "construction" and "establishment." The District Court gave the Circular the measure of deference prescribed by Skidmore v. Swift & Co., 323 U.S. 134 (1944), but the FAA argues that the Circular actually merits the stronger form of deference called for by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). The FAA makes this argument even though "interpretations contained in policy statements, agency manuals, and enforcement guidelines" generally do not fall within Chevron. Christensen v. Harris County, 529 U.S. 576, 587 (2000); see also Alaska Dep't of Envtl. Conservation v. EPA, 124 S.Ct. 983, 1001 (2004) (agency interpretation in "internal guidance memoranda" not entitled to Chevron deference). We find it unnecessary to decide this question, because even if we accept the Circular's definitions of the key statutory terms, the Happy Landing Landfill facility falls within the grandfather clause. Thus, we will assume for the sake of argument that the definitions in the Circular accurately capture the statutory meaning.

### C.

Eagle argues that it commenced the "construction" of the Happy Landing Landfill before the Wendell Ford Act became law on April 5, 2000. The FAA Circular, as previously noted, defines "construction" as follows:

> a. Construct a municipal solid waste landfill means excavate or grade land, or raise structures, to prepare a municipal solid waste landfill as permitted by the appropriate regulatory or permitting authority.

In arguing that its activities at Happy Landing Landfill prior to April 5, 2000, fall within this definition, Eagle notes in particular that it completed the installation of 12 groundwater monitoring wells in June 1996 at a cost of nearly $35,000 and that the process of installing such wells generally requires digging and the placement underground of inner and outer well casings, gravel, screens, sealing material, and pumps or bailers. Eagle also points out that the state permit that mandated the installation of these wells described this process as "major construction activity." Appellant's Br. at 17, 19. Eagle contends that the installation of the wells involved both the

15

"excavat[ion]" of land and the "rais[ing]" of "structure[s]." Id. at 15-22.

We will analyze this argument in two parts. First, we will consider whether Eagle's installation of the groundwater monitoring wells constituted "construction" under the definition in the FAA circular. Second, we will address the question whether the revocation of Eagle's permit prior to April 5, 2000, affects the applicability of the grandfather clause.

Turning to the first of these questions, we conclude that the installation of the wells comes easily within the Circular's definition. In order to install the wells, Eagle "excavate[d]," i.e., dug out, land. See Webster's Third New International Dictionary 791 (1971) (defining "excavate" as "to hollow out: form a cavity or hole in," "to dig out and remove (as earth or mineral matter)"). In addition, Eagle also installed an access road and a silt perimeter fence, and these activities also involved excavation. Moreover, all of these activities were done, in the words of the Circular, "to prepare a municipal solid waste landfill."

It also seems likely that the installation of the wells amounted to the "rais[ing]" of "structures." That the wells qualify as "structures" seems obvious, see Webster's Third New International Dictionary 2267 (1971) (defining a "structure" as "something constructed or built"), and while it is somewhat awkward to speak of the "raising" of an underground structure, such usage falls within the broad definition of the term "raise." See id. at 1877 (defining "raise" to mean, among other things, "construct"). This interpretation is plausible in the present context since most construction at a landfill site is underground, and there are other situations (for example, building a subway) in which it is natural to speak of underground construction. We note that the FAA has not argued that the reference in its Circular to the "rais[ing]" of structures is limited to above-ground construction. In any event, because Eagle's activities involved "excavation" and because this is sufficient to invoke the grandfather clause, we need not decide whether Eagle also "raise[d]" structures.

The FAA argues that Eagle's installation of the groundwater monitoring wells was not "construction" but "preconstruction" activity "undertaken to determine the viability of the site, in anticipation of the construction of the landfill, but not as part of its construction." FAA's Br. at 26. As noted, however, the Circular refers to excavation done "to prepare" a landfill. Installation of wells for the purpose of establishing to the satisfaction of state regulators that a site is suitable falls within the scope of "prepar[ation]."

The FAA notes that our prior opinion in this case characterized the installation of the wells as "pre-construction," see Khodara Envtl., Inc., 237 F.3d at 188 ("After obtaining these permits, Eagle began pre-construction by conducting engineering surveys and

16

installing monitoring wells."), but this language is of little significance for present purposes. We used the term "pre-construction" in passing and without reference to the grandfather clause. At issue here is not the meaning of "construction" in ordinary parlance but the definition that the FAA placed in its Circular. Our casual reference to "pre-construction" is no more controlling on that issue than the description of the installation of the wells in Eagle's permit as "major construction activity."[2]

Jefferson County and Pine Creek Township make the interesting argument that the Happy Landing Landfill facility cannot fall within the grandfather clause because Congress adopted the statutory provision at issue for the very purpose of blocking Happy Landing Landfill. It is a sufficient response to this argument to observe that – as all the defendants have strenuously advocated – we are applying

the definition of "construction" that was adopted by the FAA in its Circular. If Jefferson County and Pine Creek Township feel that the FAA's definition does not comport with Congress's objective, they should not have urged us to defer to that definition. Jefferson County and Pine Creek Township contend that the operation of the Happy Landing Landfill will pose a threat to aircraft using the local airport, but we must presume that the interpretation of the grandfather clause adopted by the FAA, the agency with expertise in the field, takes aviation safety fully into account.

We therefore turn to the second question noted above, i.e., whether the revocation of Eagle's permit prior to April 5, 2000, affects the applicability of the grandfather clause. The District Court answered this question in the affirmative and wrote:

> We think that implicit in the Advisory Circular's definition of "construct[ion] of a municipal solid waste landfill" is a temporality requirement: i.e., the landfill must have been under construction *and* permitted by the appropriate regulatory or permitting authority" *as of April 5, 2000.* This requirement Eagle did not meet, as its Solid Waste Permit was still under suspension in April of 2000.

---

[2]At oral argument, counsel for the FAA agreed that the statement in Khodara I does not bind us in any way. The FAA contends, however, that the Wendell Ford Act's grandfather clause was intended to distinguish between true "construction," which is freighted with developer and community expectations, and "preconstruction" activity, which is not. We acknowledge that this distinction may make sense as a matter of policy, but neither the Act itself nor the FAA's interpretation in the circular gives effect to such a policy.

App. 51a-52a (emphasis in original).

In a similar vein, the FAA argues that because "no construction was 'permitted by the appropriate regulatory or permitting authority' *as of* the effective date of the statute," Eagle does not fall within the exception as interpreted by the FAA. FAA's Br. at 26 (emphasis added). This argument overlooks the fact that the grandfather clause speaks of the "commence[ment]" of construction "**on or before**" the date of the enactment of the Wendell Ford Act, 49 U.S.C. § 4717(d) (emphasis added), not "**as of**" that date. Accordingly, "construction," as defined in the FAA Circular, must have "commence[d]" "on or before" April 5, 2000. This means that "on or before" that date, Eagle must have begun to "excavate . . . land . . . to prepare a municipal solid waste landfill as permitted by the appropriate regulatory or permitting authority." In other words, the excavation must have been "permitted by the appropriate regulatory or permitting authority" on the date of commencement, and this date must have been "on or before April 5, 2000." This reading includes "a temporality requirement," but not the one identified by the District Court.[3]

_____

[3] The District Court stated that without its "temporality requirement," the grandfather clause could produce the following "absurd result": "a landfill – once permitted remotely in time – would reap the benefit of § 503(d)(2)'s [§ 503(b)'s] exception indefinitely." App.

In sum, we hold that Eagle commenced construction of the Happy Landing Landfill within the meaning of the FAA Circular prior to the effective date of the Wendell Ford Act.

VI.

_____

46. In light of the narrow scope of Section 503(b), however, it may well be that this situation will never arise. It should be kept in mind that, prior to the adoption of FARA and § 503(b), the FAA generally prohibited the location of a landfill within five miles of an airport. See Khodara I, 237 F.3d at 189 n.3. Thus, in order to fall within the District Court's hypothetical all of the following conditions would have to be met: (1) the landfill site would have to be located between five and six miles from an airport; (2) the airport would have to have received a federal grant of the type specified in Section 503(b); (3) the airport would have to be one that is "primarily served by general aviation aircraft and regularly scheduled flights of aircraft designed for 60 passengers or less; (4) the construction or establishment of the landfill would have to have commence pursuant to state authorization prior to April 5, 2000; and (5) completion of the landfill, for some reason, would have to be delayed "indefinitely." App. 52a. The class of landfills satisfying all of these conditions is almost certainly very small and may well be nonexistent.

18

For the reasons set out above, we reverse the order of the District Court granting summary judgment for the defendants and remand for the entry of summary judgment in favor of the plaintiff and for the issuance of a declaratory judgment that the Happy Landfill falls within the grandfather clause of the Wendell Ford Act.